Case No. _____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

IN RE VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., ET AL.,

*Debtors.*

———————————

WARNER BROS. ENTERTAINMENT INC.,

*Petitioner-Appellant,*

v.

VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., ET AL.,

*Appellees.*

———————————

Appeal from the United States District Court for the District of Delaware in Civil Action No. 25-cv-01045

———————————

## EMERGENCY MOTION OF WARNER BROS. ENTERTAINMENT INC. FOR A STAY PENDING APPEAL

———————————

CURTIS S. MILLER (NO. 4583)
MATTHEW B. HARVEY (NO. 5186)
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: cmiller@morrisnichols.com
         mharvey@morrisnichols.com

SCOTT P. DRAKE
EMMA L. JONES
**O'MELVENY & MYERS LLP**
2801 North Hardwood Street, Suite 1600
Dallas, Texas 75201
Telephone: (972) 360-1900
Email: sdrake@omm.com
         eljones@omm.com

STEPHEN H. WARREN
**O'MELVENY & MYERS LLP**
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 430-6000
Email: swarren@omm.com

*Counsel for Appellant Warner Bros. Entertainment Inc.*

Appellant Warner Bros. Entertainment Inc. ("Warner Bros.") respectfully moves (this "Motion")[1] for entry of an order pursuant to Rules 8(a)(2) and 27 of the Federal Rules of Appellate Procedure (the "FRAP") and L.A.R. 8.1 and 8.2, granting a stay of the Appellee-Debtors' sale (the "Sale") of the Derivative Rights to Alcon Media Group, LLC ("Alcon"), pending Warner Bros.' appeal before the District Court in Civil Action No. 25-cv-01045 of the Bankruptcy Court's *Order (I) Approving the Sale of the Derivative Rights Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Bankr. D.I. 1043] (the "Sale Order"), A00020, that adopts by reference the Bankruptcy Court's *Memorandum Opinion* [Bankr. D.I. 1027] ("Opinion"), A00001, regarding the Sale.  In support of this Motion, Warner Bros. respectfully states as follows:

---

[1] Capitalized terms used but not otherwise defined in this Motion shall have the meanings as otherwise set forth in the Sale Order (as later defined) or supporting Smith Declaration filed in support of *Warner Bros.' Entertainment Inc.'s Emergency Motion for a Stay Pending Appeal* [D.I. 10], A01863 (Smith Decl.). Citations to "D.I." unless otherwise noted herein are citations to docket entries in District Court Civil Action No. 25-cv-01045 whereas citations to "Bankr. D.I." are citations to docket entries in Bankruptcy Case No. 25-10475.  References to Appendix page numbers that appear before the parenthetical description of a cited document indicate the initial Appendix page number of that document as it appears in the Appendix of exhibits, which Warner Bros. will file contemporaneously with this Motion.  Unless otherwise stated, all emphasis is added and quotations omitted.

## I.    <u>PRELIMINARY STATEMENT</u>

Warner Bros. seeks to preserve the status quo pending its appeal of the Bankruptcy Court's Sale Order, which would permit the Debtors to "sell" the rights to co-finance Warner Bros. motion pictures to a third-party buyer, Alcon, over Warner Bros.' objection.  Alcon is a heavily leveraged film investment vehicle that previously launched contentious litigation against Warner Bros.  The films at issue include major motion picture franchises such as *Joker*, *Matrix*, and *Mad Max*.  The Sale compels Warner Bros. to involuntarily advance potentially hundreds of millions of dollars for multiple pictures on behalf of Alcon over a perpetual term, disclose confidential information regarding its pending film projects to Alcon and share credit on Warner Bros.' films with Alcon.

If the Sale closes notwithstanding Warner Bros.' appeal, even a reversal could not afford Warner Bros. any effective relief in light of 11 U.S.C. § 363(m) and the Debtors' plan to close the Sale to Alcon immediately. What is more, on December 23, 2025, the District Court denied Warner Bros.' request for a stay of the Sale pending its appeal of the Sale Order before that Court. Thus, while Warner Bros. believes the Fed. R. Bankr. P. 8025(a) 14-day stay of the District Court's Order may be in effect, Warner Bros. requests an immediate stay of the Sale Order out of an abundance of caution to prevent the Debtors' attempt to close the Sale to Alcon. In denying Warner Bros.' request for a stay pending appeal, the District Court

concluded, *inter alia*, that Warner Bros. does not have a likelihood of success on the merits and will not be irreparably harmed. Warner Bros. respectfully disagrees and files this Motion on an emergency basis to prevent immediate irreparable harm. Warner Bros. requests, at a minimum, an interim stay pending the Court's determination of this Motion. *See generally In re Lordstown Motors Corp. S'holder Derivative Litig.*, 2022 WL 670940, at *1 (D. Del. 2022) ("Because a short stay will limit prejudice while streamlining this case, I will grant one.").

To secure a stay pending appeal, Warner Bros. need only show that there is a likelihood of success of the merits on appeal or at least a substantial case on the merits, and that Warner Bros. will be irreparably injured absent a stay. After Warner Bros. makes that requisite showing, the Court must assess the harm to other opposing parties, and whether the public interest favors a stay. Here, Warner Bros. more than satisfies the stay request standard for several reasons:

*First*, Warner Bros. is likely to succeed on the merits, or at least presents a substantial merits case justifying a stay. The Sale at issue involves Alcon's purchase of the Debtors' rights to co-finance remakes, sequels and prequels of approximately 91 Warner Bros. motion pictures (the "Derivative Rights," as qualified by its definition below), including the assignment to Alcon of the underlying Derivative Rights Agreements (as later defined) with Warner Bros.as part of that Sale. Those

Agreements, which are inextricably intertwined with the Derivative Rights,[2] cannot be assumed or assigned to Alcon over Warner Bros.' objections due to several express limitations in the Bankruptcy Code. As a result—contrary to the Bankruptcy Court's erroneous conclusion otherwise—the Sale to Alcon cannot close.

Specifically, three provisions of the Bankruptcy Code prohibit the assignment of the Derivative Rights Agreements to Alcon. The first is that the Derivative Rights Agreements constitute financial accommodations that are unassignable under 11 U.S.C. § 365(c)(2). The evidence at the Sale Hearing demonstrates that the Derivative Rights Agreements place Warner Bros. in the contractually-defined position of "Production Lender," obligating it to finance tens or hundreds of millions of dollars to produce each film for the benefit of the counterparty to those Agreements whenever Warner Bros. elects to make a subject derivative work. That position is a risky one for Warner Bros.—a position it took on only as part of a trusted, long-standing business relationship with the Debtors. If the Sale closes, Alcon would benefit from this "no money down" financing whenever Warner Bros. makes covered derivative works and Alcon elects to participate. Alcon would only

---

[2] The parties to this appeal stipulated that the Sale of Derivative Rights to Alcon was conditioned on assumption and assignment of the Derivative Rights Agreements, subject to Warner Bros.' and Regency's objections to the Sale. A01028 (Scheduling Order) at A01031-32. The Derivative Rights Agreements and Derivative Rights are not distinct assets; Warner Bros. maintains that they are not severable from one another.

repay Warner Bros. its share of production costs upon release, potentially years in the future.  Alcon will also receive highly confidential information and market analysis indicating the likelihood of a derivative work's commercial success.  If Alcon decides it made a bad bet and refuses to pay, Warner Bros. is left to try and collect. That is the risk against which the "financial accommodation" exception to section 365 of the Bankruptcy Code protects.  And this is the exact scenario that occurred when the Debtors breached their co-financing obligations after Warner Bros. produced *Matrix IV*, resulting in an initial arbitration determination against the Debtors of over $100 million and forcing both sides to spend millions of dollars during three years of litigation.

Despite this, the Bankruptcy Court determined that it was "unnecessary to decide whether the co-financing is a financial accommodation," because "the nature of the entire transaction is not one of financial accommodation."  A00001 (Mem. Op.) at A00011.  In doing so, however, the Bankruptcy Court contradicted its later conclusions that both Warner Bros.' and the Debtors' "primary" duty or obligation under the Derivative Rights Agreements was to "co-finance derivative projects."  *Id.* at A0014.  Its conclusion was also contrary to case law from courts in this Circuit as well as the most recent holding from outside the Circuit construing financial accommodations..

Moreover, the Derivative Rights Agreements are so personal in nature that they cannot be assigned absent Warner Bros.' consent under applicable California law incorporated by 11 U.S.C. § 365(c)(1). The Bankruptcy Court neglected to consider the ample evidence that the Derivative Rights Agreements were founded on trust and confidence, constituting agreements that are protected from assignment.

In addition, Alcon has failed to provide Warner Bros. with adequate assurance of future performance under 11 U.S.C. §§ 365(f)(2) and 365(b)(1). The Bankruptcy Court's Opinion incorrectly determined that the highly inflammatory, pending litigation Alcon commenced against Warner Bros. has nothing to do with the present Sale. Alcon is not a trusted partner who can co-finance Warner Bros.' films under the Derivative Rights Agreements. As to Alcon's financial wherewithal, the Bankruptcy Court improperly extrapolated from Alcon's past and potential future ability to upsize its inadequate capital availability. It did so rather than consider the evidence demonstrating that Alcon is now highly leveraged, without any existing commitments to cover the financing at issue.

*Second*, Warner Bros. will suffer irreparable harm absent a stay. Warner Bros. will immediately become party to the Derivative Rights Agreements with an objectionable counterparty, who will receive involuntary financing from Warner Bros. as well as highly confidential and sensitive information about upcoming film projects. The Debtors have already improperly shared sensitive information

7

regarding Warner Bros.' up-coming derivative film *Practical Magic 2* with Alcon despite Warner Bros.' objection.[3]  Absent a stay, Bankruptcy Code section 363(m) would also statutorily moot the relief that would be afforded to Warner Bros. Thus, a further stay is critical to ensure Warner Bros. can be afforded effective relief.

*Third*, no other party will suffer substantial harm from a stay.  The Debtors have shown no urgency to close the Sale:  they extended the Sale Hearing for over four months, delayed providing Warner Bros. with the Derivative Rights APA during that period, and have otherwise shown no exigency to close a Sale (other than their plan to moot Warner Bros.' appeal).  The Debtors are winding down, with no chapter 11 plan yet on file.  As part of the sale process, Warner Bros. submitted its own bid covering the assets, which was already accepted by the Debtors as the "Back-Up Bid" that will close if the Alcon Sale is overturned.  Thus, Warner Bros. is not seeking to deprive the estate of value. Should the Sale Order be reversed, the estate will receive—***at a minimum***—$17.5 million from Warner Bros. in connection with the Sale given Warner Bros.' Back-Up Bid.  Indeed, Warner Bros. has even offered to increase its bid to $19.5 million ($1 million more than the Alcon bid). Thus, the estate will be ***better off*** if Warner Bros. prevails on the appeal. Nor is there any meaningful harm to other creditors. Warner Bros. is by far the Debtors' largest

---

[3] Warner Bros. reserves all rights in connection with *Practical Magic 2*, as discussed *infra*.

unsecured creditor, and should not be unduly prejudiced solely to benefit other creditors who are junior to Warner Bros.

*Fourth*, to the extent the public interest is implicated in this dispute, it supports staying the Sale Order until Warner Bros.' legal impediments to closing under the Bankruptcy Code are addressed. The public maintains an interest in the correct application of the law, and Warner Bros. has a strong likelihood of success on the merits of its appeal.  By imposing statutory restrictions on the assignment of contracts like the ones at issue, Congress has already determined that the public interest is at stake.  Moreover, there is an important federal interest in protecting creators of copyrighted material like Warner Bros.  The appeal also presents the District Court and, if necessary, this Court with an opportunity to clarify that financial commitments like the Derivative Rights Agreements constitute financial accommodations.  Finally, if the Sale to Alcon closes, there is a substantial likelihood of future litigation over newly financed films, with the attendant waste of resources.

For all the reasons set forth in this Motion, the Court should grant an immediate stay of the Sale Order.

## II.    **JURISDICTION**

This Court has jurisdiction under 28 U.S.C. § 158(d)(1) to entertain this appeal. 28 U.S.C. § 158(d)(1) ("The courts of appeal shall have jurisdiction of

appeals from all final decisions, judgments, order, and decrees" entered under subsections 158(a) and (b)."). *See also In re Revel AC, Inc.*, 802 F.3d 558, 567 (3d Cir. 2015) (holding district court's stay denial in the context of appellant's appeal of a sale order was final and appealable in light of 11 U.S.C. § 363(m) for purposes of 28 U.S.C. § 158(d)(1)); *see also In re The Diocese of Camden, New Jersey*, No. 24-2065 (3d Cir. Aug. 8, 2024) (declining to dismiss appeal of district court stay denial order for purported lack of jurisdiction where appeal involved a confirmed plan of reorganization).

Moreover, Fed. R. App. P. 8(a)(2) permits Warner Bros. to seek a stay of the Sale Order pending the disposition of its appeal before the District Court. L.A.R. 8.1 similarly permits Warner Bros. to seek a stay pending its appeal before this Court on an expedited basis pursuant to L.A.R. 8.1 and in accordance with L.A.R. 27.7.

## III.    STATEMENT OF THE CASE AND FACT BACKGROUND

While the procedural and factual history of Warner Bros.' 20+ year contractual film financing relationship with the Debtors is long and complex, the most relevant facts for purposes of this Motion are straight-forward:

### A. Warner Bros.' Relationship with the Debtors.

Warner Bros.—a studio that, among other things, produces its own motion pictures—finances many of those pictures itself.    A01863 (Smith Decl.)at A01864(declaration submitted in support of stay pending appeal, *see Revel*, 802 F.3d

at 572 (noting the "adequacy of proof provided plays an important role," including a "declaration or other evidence in the record that a stay would cause substantial harm.")). However, Warner Bros. also co-finances a number of pictures with other qualifying studios and specialized film-financing investors. *Id*. Over the past 25 years, the Debtors have co-financed motion pictures with Warner Bros. *Id*. Warner Bros. has never invited the proposed buyer, Alcon, to co-finance Warner Bros.' films. *Id*. at A01869.

A film co-financing relationship requires a high degree of trust and cooperation. *Id*. at A01865. Warner Bros. shares with its co-financier confidential information about its upcoming film projects. *Id*. Those parties share credits on the resulting films and participate in media events and communications. *Id*.

Since 1998, when the Debtors were a family-owned business, Warner Bros. and the Debtors entered numerous agreements defining their respective co-financing rights and obligations for Warner Bros. motion-pictures. *Id*. Warner Bros. and the Debtors have co-financed 91 Warner Bros. motion pictures under those arrangements. *Id*.

### a. The Debtors' relationship with Warner Bros. narrows to co-financing only *Warner Bros. derivative works.*

The nature of Warner Bros.' and Village's co-financing relationship changed over the years. *Id*. After the Debtors were acquired by a hedge fund (*e.g.*, Vine Alternative Investments Group, LLC, "Vine"), Warner Bros. elected to not extend

its prior deal with the Debtors. *Id*. As a result, the parties are only engaged in co-financing derivative works (*e.g.*, remakes, sequels, prequels) of the motion pictures co-financed prior to 2021. *Id*. at A01865-66.

For nearly all co-financed pictures, Warner Bros. and the Debtors entered into a Co-Ownership Agreement. *Id*. at A01866. The Co-Ownership Agreements generally set forth the parties' rights to produce, distribute, and exploit derivative works that Warner Bros. may create for the 91 co-financed films (the "Derivative Rights"). *Id*. The Co-Ownership Agreements, as amended in 2017 and 2020, alongside other contracts incorporated by reference therein, constitute the "Derivative Rights Agreements". *See id*.

### b. Warner Bros. fronts all production costs on the Debtors' behalf once they commit to co-finance a derivative work.

The Derivative Rights Agreements expressly provide Warner Bros. with the "unilateral right" and "sole discretion" over the development of Derivative Rights projects, and contain specific requirements on when Warner Bros. is required to offer the Debtors a co-financing opportunity. *See id*. at A01866; A02636 (2017 Omnibus Amend.). For any covered derivative works that Warner Bros. develops, and that the Debtors elect to co-finance, the agreements make clear that *Warner Bros. will front all production costs if the Debtors commit to co-finance a derivative work*. A01863 (Smith Decl.) at A01866; A02273 (2014 MPRPA); A02454 (2020 MPRPA); A02636 (2017 Omnibus Amend.).

### c. *The parties' relationship deteriorates.*

For many years, Warner Bros. enjoyed a beneficial relationship with the Debtors.  A02027 (Smith Written Direct) at A02050.  However, after the Debtors were acquired by Vine, that relationship quickly deteriorated and the parties became embroiled in pre-bankruptcy litigation.  *Id*.  That litigation includes confidential arbitration proceedings Warner Bros. was forced to initiate in 2022 against the Debtors over their breach of agreement to co-finance the *Matrix IV* motion picture.  *Id*. at A02051.

In July 2023, Warner Bros. secured a liability determination against the Debtors and an arbitration award of over $107 million in damages over *Matrix IV*.  *Id*. at A02052.  That liability determination was affirmed by the arbitration appellate panel, who reversed only as to the amount of Warner Bros.' damages.   *Id*. at A02053.  The final hearing to determine the amount of Warner Bros. damages against the Debtors was scheduled for early December 2025, *see id*. at A02054, and has since been held.  The final opinion by the panel has not yet been issued.

## B. The Debtors Commence These Bankruptcy Cases Following Warner Bros.' Securing an Initial *Matrix IV* Arbitration Award Against Them.

On March 17, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code.  A02005 (Maib Decl.) at A02006.  The Debtors' assets consist primarily of three buckets: their interests in the Library Assets (interests in already produced films), the Derivative Rights (financed interests

in related films that may hereafter be produced), and their independent "Studio Business." *Id*. at A02009-12.

### a. The Debtors are liquidating with enough cash to fund its limited post-sale operations pending their filing of a chapter 11 plan.

The Debtors filed these bankruptcy cases with the stated aim of selling off their assets through one or more sales. *Id*. at A02006-27. The Debtors secured debtor-in-possession financing with Bankruptcy Court approval to fund that process. A00600 (DIP Order). As of the Petition Date, the Debtors employ only two executives and three at-will administrative professionals in the U.S. and six financial professionals in Australia. A02005 (Maib Decl.) at A02012. The Debtors are in the process of liquidating and winding down. Notably, the Debtors have not yet filed their chapter 11 plan of reorganization.

The Debtors sold their Library Assets to Alcon for a purchase price of $417.5 million, which closed on July 23, 2025. A00729 (Library Sale Order); A00885 (Library Sale Closing Notice). $110 million of those sale proceeds have been set aside in a reserve for Warner Bros. pending a determination of its damages award in the Matrix Arbitration. A00600 (DIP Order) at A00660. According to and as of their October monthly operating reports, the Debtors have approximately $11 million in cash or cash equivalents after payment of other senior or sale-related obligations and reserves. *See, e.g.* A01708 (Oct. Monthly Operating Report) at A01723.

### b. Warner Bros.' and Regency's objections to the Derivative Rights Sale to Alcon.

On May 28, 2025, the Debtors conducted an auction that both Warner Bros. and Alcon participated in to bid for the Derivative Rights. A00981 (Auction Tr.). The Debtors' selected Alcon as the "Successful Bidder" for the Derivative Rights, with a bid of $18.5 million, and Warner Bros. as the designated "Back-Up Bidder," for those same assets, with a bid of $17.5 million. A00720 (DR Successful Bidder Notice) at A00720-21.

Warner Bros. objected to the Debtors' proposed sale of Derivative Rights to Alcon initially as part of a larger objection in connection with the Debtors' proposed sale of its other bucket of assets to Alcon (the Library Assets and Studio Business) on June 13, 2025. A02195 (W.B. Initial Obj.). Warner Bros. ultimately resolved its objections to the Debtors' proposed sale of Library Assets and Studio Business to Alcon, preserving Warner Bros.' objections and rights with respect to the Derivative Rights and Derivative Rights Agreements. A00729 (Library Sale Order), A00888-980 (Studio Sale Order). The Debtors then continued the Derivative Rights Sale hearing for over four months, until October 20-21, 2025 (the "Sale Hearing"). A01028 (Scheduling Order) at A01030, 33.

During that time, Warner Bros. tried to resolve its objections to the Sale. On September 8, 2025, Warner Bros. sent an offer to Debtors increasing its initial $17.5 million bid. A01147 (W.B. Revised Bid). Warner Bros. later renewed the offer

through the Sale Hearing, and increased the cash component to $19.5 million on October 19, 2025. A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01420.

Warner Bros. further objected to the Debtors' proposed Sale to Alcon on October 6, 2025, with supporting evidence. A02661 (Warner Bros. Supp. Obj.), A02027 (Smith Written Direct). Regency Entertainment (USA) Inc. ("Regency") joined Warner Bros. in objecting to the Sale. A02184 (Regency Initial Obj.), A01151 (Regency Supp. Obj.). Regency supported Warner Bros. as a buyer for the Derivative Rights over Alcon. *Id.*

Given the high degree of trust and cooperation and sharing of confidential information involved under the Derivative Rights Agreements, Warner Bros. objected to Alcon as purchaser of the Derivative Rights on the basis that Alcon was not a suitable counterparty to acquire them. A01863 (Smith Decl.) at A01870, A01872. Among other things, Alcon initiated litigation against Warner Bros. in California federal court. *Id.* at A01870. In making a number of inflammatory allegations against Warner Bros., and in characterizing the parties' relationship as one of "significant friction," Alcon is not a party that Warner Bros. should be forced into a perpetual relationship with over the Derivative Rights. A02027 (Smith Written Direct) at A02066, A02074.

### c. The Bankruptcy Court enters the Sale Order approving the Sale to Alcon, and Warner Bros. appeals to the District Court while seeking an emergency stay.

On November 5, 2025, the Court published its Opinion approving the Sale to Alcon, including the assumption and assignment of the Derivative Rights Agreements, overruling Warner Bros.' and Regency's objections.  A00001.

On November 11, 2025, the Court entered the Sale Order.  A00020. Warner Bros. timely filed a notice of appeal of the Sale Order on November 18, 2025, which such appeal remains pending before the District Court. A00123.

That same day, Warner Bros. filed an emergency motion for stay pending appeal before the Bankruptcy Court.  A01669. The Bankruptcy Court held an expedited contested hearing on that motion on November 24, 2025, and subsequently denied Warner Bros.' primary requested relief, determining, *inter alia*, that Warner Bros. did not establish a likelihood of success on the merits warranting a stay pending appeal.  A01738 (Nov. 24, 2025 Bankr. Hr'g. Tr.).  The Bankruptcy Court, however, granted Warner Bros' alternative relief of an additional interim 14 day stay.  A00234 (Bankr. Order Denying Stay).

Warner Bros. next immediately sought emergency stay relief before the District Court on November 25, 2025.  A01793 (Dist. Ct. Mot.).

### *d. The District Court ultimately denies Warner Bros.' requested stay pending appeal; the Sale Order appeal remains pending.*

On November 26, 2025, the District Court entered an oral order awarding Warner Bros. an interim stay pending the District Court's determination of that motion. A00349. On December 5, 2025, the Appellee Debtors and Alcon filed oppositions to Warner Bros.' Dist. Court Stay Motion. A01934 (Debtors' Obj.), A02137 (Alcon Obj.). And on December 12, 2025, Warner Bros. filed its reply. A01977 (W.B. Reply).

On December 23, 2025, the District Court denied Warner Bros.' Dist. Court Stay Motion. AP0__ (Dist. Court Order Denying Stay Mot.) & (Dist. Court Memorandum Op.). Warner Bros. now appeals that denial and seeks emergency relief before this Court.

## IV.   ARGUMENTS & AUTHORITIES

Courts in this Circuit consider four factors when deciding whether to grant a stay pending appeal: (i) whether the appellant has a made a strong showing that it is likely to succeed on the merits, or at least a "substantial case" on the merits; (ii) whether the appellant will be irreparably injured absent a stay; (iii) whether the stay will substantially harm other interested parties in the litigation; and (iv) whether the stay is in the interest of the public. *Revel*, 802 F.3d at 565; *see also, e.g.*, *S.S. Body Armor I, Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 771 (3d Cir. 2019); *In re AIO US, Inc.*, No. 24-11836, at 5 (Bankr. D. Del. Oct. 30, 2025) [D.I. 1673].

The first two factors are "the most critical." *Body Armor*, 927 F.3d at 772 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Among those two factors, the Third Circuit has opined "the former [likelihood of success on the merits] is arguably the more important piece of the stay analysis." *Id.*

Upon satisfaction of the first two factors, courts assess the harm to the opposing parties and weigh the public interest. *Id.* Under this test, Third Circuit courts "balance the harms by weighing the likely harm to the movant absent a stay, the second factor, against the likely harm to stay opponents if the stay is granted, the third factor." *Id.* (citing *Revel*, 802 F.3d at 569). The public-interest factor calls for gauging "consequences beyond the immediate parties." *Id.* Ultimately, the Third Circuit has adopted a "sliding-scale" approach, where, as here, "the more likely the [movant] is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more [heavily] need [the balance of harms] weigh in [its] favor." *Id.*

Here, all four factors favoring a stay pending appellate review are met.

**A. Warner Bros. Is Likely to Succeed on the Merits.**

Warner Bros. is likely to succeed in its appeal of the Sale Order and the Bankruptcy Court's underlying determinations that (a) the Derivative Rights Agreements do not constitute unassignable financial accommodations, (b) the Derivative Rights Agreements are not unassignable personal services contracts, and

(c) Alcon has demonstrated adequate assurance of future performance in connection with assumption and assignment of those agreements.

Though the caselaw recites whether a "strong showing" has been made, to satisfy this factor, Warner Bros. need only show that it has "a reasonable chance or probability, of winning" on appeal. *Body Armor*, 927 F.3d at 772; *see also Revel*, 802 F.3d at 569 ("[T]he likelihood of winning on appeal need not be 'more likely than not[.]'"). This can include instances where "the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear." *Evans v. Buchanan*, 435 F. Supp. 832, 844 (D. Del. 1977); *cf. generally In re L.A. Dodgers LLC*, 465 B.R. 18, 30-34 (D. Del. 2011) (granting the appellant's stay motion, citing its "strong likelihood of success on the merits" because the "Bankruptcy Court likely erred in concluding that the 'no shop' provision is unenforceable in bankruptcy," further noting "[t]he enforceability of the no shop provision is also a question upon which there is a substantial difference of opinion, *i.e.*, a 'genuine doubt as to the correct legal standard'"). This prong may also be met where, as here, the law does not conclusively establish the propriety of the court's decision. *See In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 689 (S.D.N.Y. 1995).

On appeal, Warner Bros. has three strong arguments on the merits, all of which amount to at least a substantial case based upon the express terms of Section 365 of the Bankruptcy Code as set forth below. A02195 (W.B. Initial Obj.) at

A02204-06. Subject to certain express limitations, that statute permits a debtor to "assume or reject any executory contract or unexpired lease of the debtor" in connection with a bankruptcy sale or chapter 11 plan if defaults are cured and the contract counterparty is provided adequate assurance of future performance. *See* 11 U.S.C. § 365(a)-(b). As relevant here, however, the Bankruptcy Code includes protections for non-debtor contract counter-parties that bar the assumption and assignment of certain types of contracts.

Section 365(c)(2) prevents a debtor from assuming or assigning any executory contract if "such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor . . . ." *Id*. at § 365(c)(2). Section 365(c)(1) also bars a debtor from assuming or assigning an executory contract where applicable law—*i.e.*, California law—excuses the non-debtor contract counterparty from rendering performance to an entity other than the Debtors. *See id.* at § 365(c)(1). In addition, the Debtors are statutorily required to provide adequate assurance of future performance in connection with the assumption and assignment of the Derivative Rights Agreements, which they failed to do. *See id.* at §§ 365(f)(2)(b), 363(b)(1). Warner Bros. addresses each point in turn below.

### a. The Derivative Rights Agreements constitute unassignable financial accommodations.

The Bankruptcy Court erroneously concluded that it was unnecessary to determine whether the Derivative Rights Agreements were financial

accommodations, because even if they were, the "nature of entire transaction" was "not one of financial accommodation." A00001 (Mem. Op.) at A00011. Without addressing the Derivative Rights Agreements' plain and unambiguous text, nor the cumulative and consistent testimony and evidence that Warner Bros.' role under the Derivative Rights Agreements was one of a "Production Lender," the Bankruptcy Court held that the purpose of the Derivative Rights Agreements was to jointly exploit intellectual property rights—"not for Warner Bros. to provide financing to the Debtors, but for the Debtors to provide financing to Warner Bros. to mitigate [] risk. . . ." *Id*. This result is contrary to the Derivative Rights Agreements' terms and applicable case law, as well as the extensive record developed at the Sale Hearing.

Indeed, the evidence at the Sale Hearing conclusively established that: (1) the primary purpose of the Derivative Rights Agreements is financing; (2) Warner Bros. is "the bank" that fronts all production costs; and (3) Warner Bros. takes on all of the risk of the Debtors' credit worthiness. A02079 (Debtors' DR Reply) at A02121 ("Following assignment, Alcon's primary obligations under the Derivative Rights Agreements would be to fund its co-investment share for Derivative Works . . . ."), A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01511, A01512-13, A01515; *see also* A02134 (S. Spira Dep. Tr.) at A02135. Under this structure, Warner Bros. fronts all production and marketing costs for such films, only to receive the Debtors' co-

financing share with interest that has accrued ("Production Interest")[4] when the film or project premieres. A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01363, A01365, A01385, A01512-13, A01515. Kevin Berg, the Debtors' general counsel, confirmed this financial arrangement on cross examination. *Id*. at A01363.

The evidence is also undisputed that Warner Bros. is typically carrying these costs—upwards of tens or hundreds of millions of dollars—for one or two years after the Debtors elect to participate in a film. *See id.* at A1365-66, A01369. During this time, Warner Bros. bears the entire credit risk for the film's production. *See id.* at A01479, A01482. The risk Warner Bros. takes on is "considerable" and requires a "responsible" partner. *Id.* at A01509. This risk materialized even prior to the Debtors' bankruptcy cases. Warner Bros. bore the full cost of production of the *Matrix IV* when the Debtors refused to pay their ~$107 million in co-financing share—a decision they made "after Matrix had actually been released" and its performance was known. *Id.* at A01371; *see also id.* at A01517, A01519.

In reaching its decision, the Bankruptcy Court relied on the standard set forth by the Seventh Circuit in *United Airlines*, which held "that a court must determine the nature of the entire transaction rather than hunt for features that look like loans or guarantees" when assessing whether a contract is a financial accommodation

---

[4] As defined in the 2014 MPRPA, as incorporated by reference in the 2017 Omnibus Amendment to the Co-Ownership Agreements. *See* A02273 (2014 MPRPA).

under section 365(c)(2). *In re United Airlines, Inc.*, 368 F.3d 720, 724 (7th Cir. 2004); A00001 (Mem. Op.) at A00011. However, the standard described in that case actually supports Warner Bros.' position. To determine what is or is not a financial accommodation, the Seventh Circuit emphasized that it was important to focus on "the actual features of the transaction":

> to the extent that the eleventh circuit called this a quest for the principal or primary 'purpose,' we are skeptical; the context of business entities' heads are elusive. 'Purpose' usually is covered by quicksand. Who can tell what the negotiators were thinking? Why should their thoughts matter? Nothing in the statutory text requires resort to anyone's purposes. *Better to concentrate on the actual features of the transaction—an objective rather than a subjective approach.*

*United Airlines*, 368 F.3d at 724.

In its Opinion, however, the Bankruptcy Court does exactly what the Seventh Circuit cautioned against. *See* A00001 (Mem. Op.) at A00011. The testimony of each of the Debtors', Warner Bros.', and Alcon's witnesses was consistent: under the Derivative Rights Agreements, Warner Bros. finances upwards of tens or hundreds of millions of dollars to produce a film over a years' long period before the Debtors make any payments to Warner Bros. A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01365-66, A01478-79, A01482.

And to the extent that the court in *United Airlines* determined that the contract before it was not a financial accommodation, the facts here are clearly distinguishable. *United Airlines* held that a credit card merchant's agreement with

a debtor was not a financial accommodation. There, the counterparty extended credit to the Debtors' customers, not to the debtor. *United Airlines*, 368 F.3d at 724. The alleged financial accommodation in the contract was an implicit guaranty in case of excessive credit card charge-backs by customers. *Id*. The Seventh Circuit doubted that such guaranty was even included in the parties' agreements, and noted that such excess charge-back situation had never occurred in the parties' relationship. *Id*. at 724 ("Guaranty plays an objectively small role in the arrangement…. It comes into play only when the net balance of payments is negative, which has never occurred in their experience."). In any event, no such financial accommodation was actually being assumed by the debtor. *Id*. at 723 "[t]he promise to extend credit . . . is not something [the debtor] has assumed . . . ."). In fact, the merchant processor did not actually deposit anything in the debtor's account, and was only an intermediary akin to an "[i]nternet service provider" or a "courier that moves paper." *Id*.

The facts related to the Derivative Rights Agreements stand in stark contrast. Here, the financing terms are a central feature (not a small role) and they apply to every film financed by the parties. Warner Bros. is not a pass-through intermediary or courier of funds; instead, it finances the Debtors' share of costs for the production of films. The Derivative Rights Agreements make clear that the primary purpose is for Warner Bros. to provide the Debtors with a financial accommodation through its extension of credit. The contracts give the Debtors the right to participate in

derivative works, but they do not have to pay up front—rather, Warner Bros. loans them money in every instance. And Alcon will clearly be assigned the right to benefit from Warner Bros.' financial accommodations if the Sale closes.

Specifically, paragraph 4(b) and 4(d) of attachment 1 to the 2017 Omnibus Amendment describes the process pursuant to which Warner Bros. offers the Debtors the opportunity to co-finance certain derivative work: Warner Bros. sends the Debtors a project notice, which the Debtors must accept within 15 business days. A02636 (2017 Omnibus Amend.). If the Debtors' accept, Warner Bros. will then produce the project *and front all production and marketing costs* for the picture, including the Debtors' share of such costs. *Id.* The Debtors must then repay Warner Bros. for its co-financing share (which is roughly its share of the film's production costs) by the time the film is released—which is generally years after the Debtors accepted the project notice. A02273 (2014 MPRPA) at A02289, A02411-12; *see also* A02454 (2020 MPRPA) at A02470, A02592-93.

Article 8 of the 2014 MPRPA—an agreement that is specifically referenced in, and which such form is incorporated by, the 2017 Omnibus Amendment— outlines Warner Bros.' role as the Production Lender, who, in return for accommodating the entire cost of producing a film, is entitled to collect accrued Production Interest along with the co-financing payment. *See* A02273 (2014 MPRPA) at A02294-95; *see also* A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at

A01363, A01365, A01385, A01512, A01513, A01515.  The promissory notes and
loan agreements executed by Warner Bros. and the Debtors for specific pictures also
evidence a commitment for the Debtors to repay Warner Bros with interest.  *See,
e.g.*, A01863 (Smith Decl.) at A01867.  The same financial accommodations are
present for all of the other pictures, whether or not the parties documented them
through separate notes.  In all cases, Warner Bros. commits to fronting all production
costs in connection with the projects the Debtors accept from the time the picture is
"greenlighted" until shortly before the picture is released, and oftentimes for an even
longer period of time.  Thus, the Derivative Rights Agreements' clear terms and
corroborating testimony of the witnesses at the Sale Hearing establish that Warner
Bros. has at least a "reasonable chance" of demonstrating on appeal that the
Agreements are financial accommodations, barring the Sale to Alcon.  *Body Armor*,
927 F.3d at 772;  *see also Revel*, 802 F.3d at 568.

Case law from the courts of this Circuit supports Warner Bros.' position that
the agreements at issue are financial accommodations and cannot be assumed.  *See
Watts v. Pa. Hous. Fin. Co*., 876 F.2d 1090, 1095 (3d Cir. 1989) (citing commentary
with approval that there is "no way" a debtor can assume a contract and thereby
compel the counter-party to extend financing); *In re Sportsman's Warehouse, Inc*.,
457 B.R. 372, 392-93 (Bankr. D. Del. 2011) (holding that "section 365(c)(2) applies
to contracts relating to "the extension of money or credit to accommodate another.").

And where a contract cannot be assumed by the debtor, as here, it cannot be assigned to a third party either. *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001) (If the debtor is unable to assume the contract under § 365, it cannot assign the contract to another party).

In *Sportsman's Warehouse*, for example, the court found that a lease agreement that included development obligations by the landlord/seller could not be assumed as a financial accommodation. *In re Sportsman's Warehouse*, 457 B.R. 372, 392 (Bankr. D. Del. 2011) ("A lease may qualify as a financial accommodation if it imposes upon the purported landlord and seller the obligation to make a significant investment in the real property for the purpose of developing or improving it for the benefit of the purported tenant and eventual buyer."). So to here, Warner Bros. as Production Lender makes a significant investment to develop the films by fronting the Debtors' co-financing share in exchange for future repayment with interest.

As pled in *Sportsman's Warehouse*, the financial accommodations Warner Bros. provides to the Debtors are far from incidental to the broader contractual arrangement. Debtors', Alcon's, and Warner Bros.' corporate representatives uniformly testified that Warner Bros. bears an immense amount of financial risk during the production of a Derivative Rights film by essentially offering the Debtors (and now potentially Alcon) a no-money-down loan for production costs. A01320

(Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01365-66, A01478-79, A01482, A01509.  This primary purpose, and the risk Warner Bros. assumes as a result, was proven by the Debtors' failure to pay Warner Bros. as the Production Lender in connection with *Matrix IV*.

The Bankruptcy Court also failed to consider the most recent case law on the subject: the Ninth Circuit's recent decision in *Svenhard's Swedish Bakery v. Bakery & Confectionary Union (In re Svenhard's Swedish Bakery)*, 154 F.4th 1100 (9th Cir. 2025), which aligns with foregoing precedent supporting Warner Bros.' position.  In *Svenhard*, the court held that section 365(c)(2)'s financial accommodations exception includes "***more*** than just loans and other debt financing" and can include arrangements for "***financial favor[s]***" that are "supplied for convenience or to satisfy a need." *Id.* at 1104-05.  The court held that a settlement agreement contained financial accommodations that were not merely incidental to it because the agreement accepted a schedule of repayments and involved the forbearance and reduction of the amount to which the counterparty would otherwise be entitled.  *Id.* at 1104-06.  The same reasoning applies equally to the Derivative Agreements, which provide for Warner Bros. to front the Debtors' share of the financing with repayment over time plus interest, deferring the Debtors' payment of their share.

### b. In the alternative, the Derivative Rights Agreements are personal trust and confidence contracts that cannot be assigned.

Warner Bros. also can demonstrate a likelihood of success on appeal in showing that the Derivative Rights Agreements are contracts based on personal trust and confidence, which precludes assignment over Warner Bros.' objection under section 365(c)(1). *See* A00001 (Mem. Op.) atA00012. In its ruling on that issue, the Bankruptcy Court correctly noted that under applicable California law, "contracts involving relationships of personal confidence and trust or personal services are not assignable by either party without the consent of the other party[.]" *Id.* at 12-13 (citing *In re Planet Hollywood Int'l Inc.*, 2000 WL 36118317, at \*4 (D. Del. 2000)). But the Bankruptcy Court erred in concluding that Warner Bros. could not overcome its presumption that a contract between two corporations is not a contract for personal services. *See id.*

Importantly, Warner Bros.' corporate representative, Wayne Smith, testified that the Derivative Rights Agreements were entered into at a time when Warner Bros.' personnel maintained a close relationship with the Debtors and their founders, the Kirby family. *See* A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01369, A01520. That relationship began to sour in 2017 after the Debtors were acquired by Vine, which, despite having assets worth billions of dollars, refused to backstop the Debtors' co-financing share for the *Matrix IV. See id.* at A01518-19. His testimony further explained how the sensitive commercial information that is exchanged

pursuant to the Derivative Rights Agreements requires the parties to trust each other. *Id.* at A01529, A01544-45.

Witnesses for the Appellees also agreed. Alcon's co-CEO, Broderick Johnson, testified that trust-based relationships are unique in the studio-financing business, in which few companies participate. *See id.* at A01475-76, A01477. Mr. Berg, the Debtors' general counsel, agreed that relationships were important in the movie studio business, and that the Debtors and Warner Bros. had maintained a close, "sister"-like, relationship prior to 2017. *See id.* at A01358, A01364-65.

In a similar case, the Delaware District Court held that section 365(c)(1) bars assignment of contracts rooted in personal trust and confidence among two corporate parties. *See Planet Hollywood*, 2000 WL 36118317, at *1 ("[B]ased on unique relationships involving the reputation and character of the contracting parties," the agreements were ones for personal services and unassignable under section 365(c)(1)); *see also EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 363 (Bankr. D. Del. 2008), *aff'd*, 382 F. App'x 135 (3d Cir. 2010) ("The identity of a party is material to the performance of a contract if the contract *is founded on* one of the parties maintaining trust or confidence in the ability to perform, judgment, or business experience of the other party.").

### c. *Alcon cannot provide adequate assurance of future performance.*

Neither the Debtors nor Alcon can provide Warner Bros. with adequate assurance of future performance as required by section 365 of the Bankruptcy Code. *See* 11 U.S.C. §§ 365(b)(1), 365(f)(2). What constitutes "adequate assurance of future performance" hinges on "the facts and circumstances of each case." *In re Carlisle Homes, Inc*., 103 B.R. 524, 538 (Bankr. D.N.J. 1988). Such facts and circumstances include a purchaser's ability to maintain a healthy relationship with a primary contract counterparty. *See generally, e.g*., *In re Tex. Health Enters., Inc.*, 246 B.R. 832, 836 (Bankr. E.D. Tex. 2000) (holding that the debtor failed to provide adequate assurance of future performance, emphasizing the parties' historical relationship and the adverse impact of their "poor" relationship on operations under the agreement at issue). This is particularly relevant to the circumstances of this case given the established adversarial relationship between Alcon and Warner Bros. A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01466-69; A01473-74, A01549-50.

Furthermore, the evidence casts doubt on Alcon's ability to perform on an ongoing basis its co-financing obligations under the Derivative Rights Agreements. Alcon appears to be highly leveraged, having already pledged its recently acquired assets from these chapter 11 cases to different debt facilities, and its current available liquidity may not be enough to cover the co-financing share for even one upcoming Warner Bros. film—*Practical Magic 2*. *See id*. at A01440-41, A01442-43, A01444, A01482. Alcon's primary argument for adequate assurance at the Hearing was that

the Smith family (of Frederick W. Smith, founder of FedEx) would be available to invest and fund Alcon's business ventures due to the parties' close relationship—but that claim is backed by no enforceable obligation whatsoever. *See id*. at A01440-41, 1101442-43, A01482. This unenforceable belief that the Smith family will financially support Alcon in the future is insufficient to demonstrate adequate assurance. *See generally In re Harnischfeger Indus., Inc.*, 294 B.R. 47, 54 (Bankr. D. Del.), *aff'd*, 316 B.R. 616 (D. Del. 2003) (concluding that a mere statement by a subsidiary in a letter that its corporate parent would provide a guarantee is insufficient to bind the parent company to guarantee the subsidiary's obligation).

Alcon also initiated outside litigation against Warner Bros. that, contrary to the Bankruptcy Court's determination otherwise, fails to provide Warner Bros. with assurance that Alcon can serve as a trusted partner in connection with the Derivative Rights. A00001 (Mem. Op.) at A00016; *but see* A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01552-53. Alcon's admission that there was already "significant friction" between the two parties is strong evidence that productive and collaborative relationship between the parties is not likely. *Id.* at A01469.

## B. Warner Bros. Will Suffer Irreparable Injury Absent a Stay.

The second factor requires that Warner Bros. demonstrate likely irreparable injury in the absence of a stay. *See Body Armor*, 927 F.3d at 772. That standard is met here for two key reasons: First, if the Sale of the Derivative Rights to Alcon

closes, Warner Bros. will immediately be forced into an ongoing relationship with Alcon under the Derivative Rights Agreements whereby Warner Bros. will be required to extend long-term financing to Alcon, share highly confidential information with Alcon and include Alcon on its film credits. A01863 (Smith Decl.) at A01872. Those Agreements do not have a specific outside time limit for their expiration. *See id*. The Derivative Rights Agreements are executory and, as demonstrated by both *Matrix IV* and *Practical Magic 2*, require Warner Bros. to share commercially sensitive "key" documents with its contract counterparty. To the extent Alcon elects to co-finance a derivative work pursuant to the Derivative Rights Agreements' terms, Warner Bros. will be forced to advance tens to potentially hundreds or millions of dollars for Alcon's benefit, and share with Alcon the draft screenplay for the film, proposed cast, and project budget, and also to share credits on major blockbuster films that far exceed any relationship between Alcon and Warner Bros. A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01369, A01446, A01473, A01478-79, A01507, A01544-45. Once this highly confidential information is provided to Alcon, the disclosure cannot be undone through legal or equitable remedies. *See e.g.*, *Hiken v. Dep't of Def.*, 2012 WL 1030091, at *2 (N.D. Cal. 2012); *Providence J. Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979). Indeed, this information can and has been weaponized against Warner Bros.—in 2022, the Debtors filed a state court action involving *Matrix IV* and another film, *Wonka*

(which Warner Bros. quickly compelled to arbitration) that disclosed confidential plot details.  *See* A02027 (Smith Written Direct) at A02051-52.

*Second*, Warner Bros. will face irreparable harm if the Sale of the Derivative Rights closes before this Court can render an opinion.  Section 363(m) of the Bankruptcy Code provides (with an exception for bad faith conduct) that "[t]he reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease . . . *unless such authorization and such sale or lease were stayed pending appeal*."  11 U.S.C. § 363(m).  Section 363(m) thus expressly limits potential relief following reversal or modification of a sale order on appeal unless that order is stayed.  *See In re BSA*, 137 F.4th 126, 152, 155 (3d Cir. 2025) (Section 363(m) "prohibits the reversal or modification of  § 363(b) sales," and "kicks in when (1) the appeal is from an authorization of a sale [under § 363(b)]; (2) the purchase was made in good faith; and (3) the sale was not stayed.").

Courts have long recognized that irreparable harm exists where, as here, effective relief cannot be granted absent a stay.  *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 351 (S.D.N.Y. 2007) (finding irreparable harm where it would "become impracticable to ever fashion effective relief for Appellants" absent a stay); *In re Tribune Co.*, 477 B.R. 465, 476 (Bankr. D. Del. 2012) (same); *see also Revel*, 802 F.3d at 571 (recognizing that irreparable harm exists where injury "cannot be

prevented or fully rectified by the tribunal's final decision"). Although certain cases suggest that mootness, alone, may not constitute irreparable injury, *see, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *10 (Bankr. D. Del. 2001), *aff'd sub nom.*, 322 F.3d 283 (3d Cir. 2003), at least one Delaware bankruptcy court has recently found otherwise in an analogous statutory context under section 364(e). *See Bayside Cap. Inc. v. TPC Grp. Inc. (In re TPC Grp. Inc.)*, 2022 Bankr. LEXIS 1901, at *19 (Bankr. D. Del. 2022) (noting "it is not clear that [appellants] will obtain meaningful relief, absent a stay, if they prevail on their appeal from the declaratory judgment ruling").

### C. No Substantial Harm to Other Parties Would Result from a Stay.

In determining whether a party will suffer "substantial" injury if a stay is granted, a court must balance the likely harm to the movant absent a stay against the likely harm to opponents if the stay is granted. *Body Armor*, 927 F.3d at 772. Stay opponents must offer more than "speculative," unsupported assertions of harm. *Revel*, 802 F.3d at 572 ("Absent some sort of declaration or other evidence in the record that a stay would cause substantial harm, the harm to [the debtor] was at best speculative."). Here, the potential harm to other parties is minimal, and the equities of the case favor granting Warner Bros. a stay pending appeal.

As an initial matter, the dispute over the Sale and the Derivative Rights primarily impacts only three parties: the Debtors, Alcon, and Warner Bros. Other

creditors are relatively unaffected, and Regency—the only other interested party relevant to this appeal—is supportive of Warner Bros.' position.  If the Sale is overturned and the Debtors close on the Sale of the Derivative Rights with Warner Bros. instead of Alcon, the Debtors' estates will not be deprived of value. Instead, the estate will receive funds for distribution: *at least* $17.5 million as part of the Debtors' designated Back-Up Bid in the exercise of their business judgment.  *See* A00720 (DR Successful Bidder Notice).  Warner Bros., however, stands ready, willing, and able to close on its $19.5 million in consideration in accordance with Warner Bros.' revised October 19, 2025 bid.  A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01420; A01320 (Oct. 21, 2025 Bankr. Hr'g. Tr.) at A01658.  Even if there is potential for harm to creditors through a delay of distributions on account of the appeal, Warner Bros. is the Debtors' largest asserted unsecured creditor and should not be unduly prejudiced solely to benefit other creditors of the estate.[5]

---

[5] Notwithstanding the lack of substantial harm to the Debtors or other parties, the Debtors are holding Warner Bros.' deposit in connection with its Back-Up Bid in the amount of $600,000, which, coupled with Warner Bros.' financial condition and the fact that *the estate will receive—at a minimum—$17.5 million on account of Warner Bros.' "Back-Up Bid" in the event of reversal of the Sale Order on appeal* (A01863 (Smith Decl.) at A01874-75) constitutes a sufficient bond should the Court require one to safeguard against any actual damages to other parties caused by a stay of the Sale Order.  *See Tribune Media Co. v. Aurelius Cap. Mgmt., L.P.*, 799 F.3d 272, 281 (3d Cir. 2015) ("The purpose [of] . . . a bond in a bankruptcy court is to indemnify the party prevailing in the original action against loss cause by an unsuccessful attempt to reverse the holding of the bankruptcy court.").

Next, there is no indication that Alcon and the Debtors have any imminent need to close the Sale, other than the desire to moot an appeal pursuant to section 363(m).  The Debtors first sought a hearing on the Derivative Rights sale on June 18, 2025, but continued it for several months until October.  *See, e.g.*, A00726 (Jun. Notice of Adjournment); *see also* A01028 (Scheduling Order).  No chapter 11 plan is yet on file, the Debtors have sufficient cash to continue funding the wind-down of its business until that occurs.  *See supra*, p. 14.  Despite Warner Bros.' repeated requests to review, the Debtors did not file nor exchange their proposed Derivative Rights sale asset purchase agreement with Alcon (the "APA") until the September 15, 2025 deadline. A01028 (Scheduling Order) at A01033, A01037 (Sept. 15, 2025 APA). The Debtors subsequently filed a further revised APA October 17, 2025. A01163 (Oct. 17, 2025 APA)—*mere days* before the Sale Hearing and after Warner Bros. had filed its objections to the Sale.  Indeed, none of the APAs that were filed were signed by the Debtors.   And the initial APA was entirely unsigned notwithstanding the Agreed Scheduling Order's mandate to the contrary.  A01028 (Scheduling Order) at A01033.

Likewise, the Debtors and Alcon amended the deadline in APA Section 7.01 to "use reasonable best efforts to seek entry of the Sale Order" from June 18, 2025 in the initial APA, to December 15, 2025 in the revised APA.  *Cf.* A01037 (September 15, 2025 APA) at A01104; A01163 (October 17, 2025 APA) at A01194,

and A00020 (DR Sale Order) (same).  The Debtors and Alcon similarly amended the outside date to close the Sale in Section 8.01(d) of the APA from July 7, 2025, to December 31, 2025.  *Cf.* A01037 (September 15, 2025 APA) at A01106; A01163 (October 17, 2025 APA) at A01196, and A00020 (DR Sale Order) (same).  APA Section 7.01 also requires the Debtors to "use commercially reasonable efforts to defend" an appeal of any Sale Order, demonstrating that Alcon and the Debtors have planned and accounted for an appeal.

Moreover, the Derivative Rights Agreements pertain to future films and there is no evidence of any imminent need to close the Sale transaction. The only derivative work currently in (now post-) production under the Derivative Rights Agreements is *Practical Magic 2*.  Warner Bros. disputes the Debtors' right to participate in *Practical Magic 2*, and also contends that the Debtors' purported, conditional acceptance to co-finance that film is invalid.  *See* A02727 (PM2 Letter). The Debtors have not yet sought to assign their purported acceptance of the Project Notice for *Practical Magic 2*.  A00001 (Mem. Op.) at A00015.  Indeed, that Warner Bros. remains in limbo while the Debtors and Alcon gain more and more knowledge about the film's potential commercial success underscores the risks that make the Derivative Rights Agreements unassignable.  *See* A01320 (Oct. 20, 2025 Bankr. Hr'g. Tr.) at A01371 (Warner Bros.' Counsel: "And so all those things that occur between the project notice acceptance and the release date when Village has to pay,

Village has now gained more information about whether or not the film may become a financial success. True?" Mr. Berg: "True.").

### D. The Public Interest Favors a Stay.

Finally, the public interest supports staying the closing of the Sale until the legal impediments to closing Warner Bros. identifies under section 365 of the Bankruptcy Code are addressed, for three main reasons.

*First*, "the public has an interest in correct application of the law." *In re Nw. Mo. Holdings, Inc.*, 2015 WL 3638000, at *3 (D. Del. 2015). The limitations on assignment and cure obligations are statutory requirements that Congress determined were necessary to protect non-debtor contract counter-parties. The issues outlined above present significant issues of law, and Warner Bros. has a strong likelihood of success on the merits with respect to those issues on appeal. This case also presents the Circuit with an opportunity to clarify this Circuit's precedents regarding the scope of financial accommodations as was recently done in the *Svenhards* case by the Ninth Circuit.

*Second,* there is also a strong federal interest in protecting creators and owners of copyrighted material, like Warner Bros. *See generally In re Patient Educ. Media, Inc.*, 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997). Warner Bros. is the creative spark behind the derivative works with exclusive rights to, *inter alia*, exploit those works.

*See, e.g.,* A02636 (2017 Omnibus Amend.) at A02652. Such rights must be respected.

*Third,* the public interest favors the ability to seek meaningful appellate review. *See Adelphia Commc'ns*, 361 B.R. at 367 ("[T]here is a significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review."); *In re Revel AC, Inc.*, 2015 WL 567015, at *5 (D.N.J. 2015) (noting the "public interest favoring the correct application of the law, and the ability to redress harm through appellate review."). As shown above, even if Warner Bros. is successful on appeal, it will not be able to unwind the Sale and terminate the unassignable Derivative Rights Agreements that constitute financial accommodations absent a stay.

## V.     **CONCLUSION**

Wherefore, Warner Bros. respectfully requests that this Court (i) grant the Motion, or in the alternative, (ii) impose an interim stay pending the Court's final determination on this Motion, and subsequently grant the Motion, imposing a stay pending the District Court's determination of Warner Bros.' appeal of the Sale Order, and any subsequent appeal thereof, and (iii) award all other relief as is just, equitable and appropriate.

*[Remainder of page intentionally left blank.]*

Dated: December 23, 2025
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Curtis S. Miller*
CURTIS S. MILLER (NO. 4583)
MATTHEW B. HARVEY (NO. 5186)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: cmiller@morrisnichols.com
       mharvey@morrisnichols.com

*-and-*

**O'MELVENY & MYERS LLP**
SCOTT P. DRAKE
EMMA L. JONES
2801 North Hardwood Street, Suite 1600
Dallas, Texas 75201
Telephone: (972) 360-1900
Email: sdrake@omm.com
       eljones@omm.com

STEPHEN H. WARREN
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 430-6000
Email: swarren@omm.com

*Counsel to Warner Bros. Entertainment Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Curtis Miller, certify as follows:

1.     I am member in good standing of the bar of the United States Court of Appeals for the Third Circuit. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

2.     This motion does not comply with the type-volume limitations of Rule 27(d)(2) of the Federal Rules of Appellate Procedure because this Motion contains 9666 words; however, Warner Bros. is filing an unopposed motion to exceed that word count contemporaneously herewith. This motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it appears in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

3.     This pleading complies with the electronic filing requirements of Local Rule 31.1(c) because Crowdstrike Falcon Malware Sensor, product version 7.31.20309.0, has been run on the file containing the electronic version of this brief and no viruses have been detected.

*/s/ Curtis S. Miller*
Curtis S. Miller (No. 4583)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing pleading was served this 23rd day of December, 2025 via email or through the Court's ECF system upon all counsel of record that are registered ECF users, including counsel for the parties to this appeal listed below and interested party Regency (see following page, incorporated by reference):

*/s/ Curtis S. Miller*
Curtis S. Miller (No. 4583)

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph M. Mulvihill (Del. Bar No. 6061)
Benjamin C. Carver (Del. Bar No. 7176)
Brynna M. Gaffney (Del. Bar No. 7402)
Rodney Square,
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jmulvihill@ycst.com
bcarver@ycst.com
bgaffney@ycst.com

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Justin R. Bernbrock
Matthew T. Benz
321 North Clark Street, 32nd Floor
Chicago, IL 60654
Telephone: (312) 499-6300
Facsimile: (312) 499-6301
Email:
jbernbrock@sheppardmullin.com
mbenz@sheppardmullin.com

Jennifer L. Nassiri
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700
Facsimile: (310) 228-3701
Email: jnassiri@sheppardmullin.com

**LANDIS RATH & COBB LLP**
Kimberly A. Brown (No. 5138)
Colin R. Robinson (No. 5524)
George A. Williams III (No. 6964)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: brown@lrclaw.com
robinson@lrclaw.com
williams@lrclaw.com

**MILLER BARONDESS LLP**
Daniel S. Miller
Colin H. Rolfs
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Email: dmiller@millerbarondess.com
crolfs@millerbarondess.com

*Attorneys for Alcon Media Group, LLC*

**CAROTHERS & HAUSWIRTH, LLP**
Gregory W. Hauswirth (Bar No. 5679)
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Telephone: 302.332.7181
Facsimile: 412.910.7510
ghauswirth@ch-legal.com

**STINSON LLP**
Sandford L. Frey (CA I.D. # 117058)
1901 Avenue of the Stars, Suite 450
Los Angeles, CA 90067-6006

| | |
|---|---|
| Alyssa Paddock (Admitted *pro hac vice*)<br>30 Rockefeller Plaza, 39th Floor<br>New York, NY 10112<br>Telephone: (212) 653-8700<br>Facsimile: (212) 653-8701<br>Email:<br>apaddock@sheppardmullin.com<br><br>**Attorneys for Debtors, Village Roadshow Entertainment Group USA, Inc., et al.** | Telephone: 310.730.7044<br>Facsimile: 310.730.7064<br>sandford.frey@stinson.com<br><br>**Attorneys for Regency Entertainment (USA), Inc.** |